UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

RONALD CHOWNING                                                                    PLAINTIFF

vs.                                                        CIVIL ACTION NO. 3:19-CV-509-CRS

HARDIN COUNTY, KENTUCKY, et al.                                        DEFENDANTS

<u>**MEMORANDUM OPINION**</u>

This matter is before the Court on the motion of Defendants Hardin County, Kentucky, John Ward, and Henry Volentine for summary judgment.  DN 50.  Plaintiff Ronald Chowning responded (DN 57), and the Defendants replied.  DN 61.  The matter is now ripe for review.

For the following reasons, the Court will grant in part and deny in part Defendants' motion.

## I.  BACKGROUND

This case arises from a traffic stop in which Hardin County Sheriff's Deputy Henry Volentine shot Ronald Chowning in his vehicle as he fled from an arrest.

On July 12, 2018, at approximately 5:15 p.m., Deputy Volentine was traveling in his patrol car on the highway behind a silver Toyota.  DN 57-2, at PageID # 1552.  Chowning was driving the Toyota, and Jennifer Duvall was sitting in the passenger seat.  DN 56-1, at PageID # 703.  Glancing in his mirror, Chowning noticed Volentine's car traveling quickly behind him and made a left turn onto a side road.  *Id.* at 732.  Volentine observed that this turn was directly in front of an oncoming vehicle, which came to a stop to avoid a collision.  DN 57-2, at PageID # 1552.

Volentine turned on his patrol car's lights and followed Chowning until his vehicle stopped on the right shoulder of the road.  DN 56-3, at PageID # 824–25.  Volentine approached Chowning's window and requested proof of insurance and the operator's licenses from both

occupants.  DN 56-1, at PageID # 703.  The Toyota's engine remained on.  DN 56-3, at PageID # 839.  Volentine returned to his patrol car to verify the licenses in the "Hardin County Control." DN 57-2, at PageID # 1552.  Volentine discovered an outstanding Jefferson County arrest warrant for Chowning.  DN 56-3, at PageID # 837.  Volentine returned to the Toyota and handed Chowning a citation for violations related to the stop.  DN 57-2, at PageID # 1553.  Volentine also informed Chowning of the outstanding warrant.  DN 56-3, at PageID # 839.[1]

Volentine allowed Chowning to make a phone call, and Volentine returned to his own vehicle to discover information on the bond.  DN 56-3, at PageID # 839.  When he returned to Chowning's window, Chowning was on the phone.  Volentine informed him of the bond amount. *Id.*  Volentine claims that after the phone call ended, Chowning was tearful and his "whole demeanor started to change."  *Id.* at 842–43.

Volentine then noticed a make-up case on the floorboard beneath Chowning's feet.   DN 56-3, at PageID # 844.  Duvall said it was her make-up bag.  *Id.*  Volentine requested to see it, and Duvall gave it to him. DN 56-2, at PageID # 774.  He opened it and discovered methamphetamine and a smoking pipe.  DN 56-3, at PageID # 844.  Chowning admitted it was his.  DN 57-2, at PageID # 1552.

Volentine then ordered "[c]ome on let's go," but Chowning did not respond.  DN 56-1, at PageID # 709, DN 56-2, at PageID # 777, DN 56-3, at PageID # 844.  The parties differ on whether Volentine gave any further commands, but agree it was clear that Volentine was instructing Chowning to exit the vehicle to be placed under arrest.  DN 56-1, at PageID # 735; DN 56-2, at PageID # 773, 777; DN 56-3, at PageID # 844.

---

[1] The warrant was purportedly issued for a failure to appear charge in connection with a possession of controlled substance offense.  DN 56-1, at PageID # 704.

Chowning then raised his window up and Volentine grabbed the door handle of the vehicle DN 56-2, at PageID # 771.  Volentine claims he then observed Chowning reach towards the center console.  DN 56-3, at PageID # 844.  He stated in his deposition that he was concerned that Chowning may have been reaching for a gun.  *Id.*[2] Volentine claims he then opened the door with his left hand and simultaneously drew his service weapon in his right hand.  *Id.* at 856–57, 860. Volentine testified he then ordered Chowning to "let me see your hands, let me see your hands and get out of the car."  *Id.* at 845.  Chowning then put the car in gear and started to drive off.  *Id.* at 864.

Volentine claims that because he was still holding onto the door handle, he had to run with the car for three or four steps.  *Id.* at 866–67.  He alleges that the momentum of the car and the swinging door caused his body to fall against the driver's side rear door.  *Id.* at 867.  He stated in his deposition, "I was kind of being drug with the car and eventually once I'm slammed up against the car, then yea, everything kind of breaks loose."  *Id.* at 866.  He testified that his body hit the car twice, and his weapon discharged the first time his body slammed into the car.  *Id.* at 867–68. He explained that "when I hit the door, that's when the gun went off." *Id.* at 867.  He testified his finger was not on the trigger and he did not intentionally fire the weapon.  *Id.* at 872-873.

Both Chowning and Duvall testified that Chowning's door was locked and Volentine never opened the door.  DN 56-1, at PageID # 710; DN 56-2, at PageID # 771.  Neither saw Volentine holding his gun.  DN 56-1, at PageID # 723; DN 56-2, at PageID # 786.  Chowning asserts that he rolled up his window and started to drive when Volentine said "come on" and grabbed the door

---

[2] Volentine's initial reports of the incident state that "Ronald would not get out of the car so I drew my gun and commanded several more times for him to exit the vehicle."  DN 57-2, at PageID # 1552, 1557.  The Kentucky State Police investigator reported Volentine's preliminary statement as: "Chowning began reaching around his right side, at which time Deputy Volentine drew his weapon."  DN 57-3, at PageID # 1566.  In an interview on July 17, 2018, Volentine related that he drew his weapon after Chowning "began to reach his hands down around the center console (which would have been his right side)."  *Id.* at 1571–73.

handle. DN 56-1, at PageID # 710.  Chowning testified that the car traveled about five feet before Volentine let go of the door. *Id.* at 711.  He asserts the shot was fired "roughly a couple of seconds after [Volentine] let go of the door." *Id.*  The bullet entered through the driver's side rear door window. *Id.* at 714.  The window shattered, and the bullet entered Chowning's left shoulder blade. *Id.* at 736.  Chowning continued to drive away. *Id.* at 715.

Volentine then returned to his vehicle to pursue the Toyota.  As he drove, Volentine alerted dispatch at 5:44 p.m. that Chowning had fled.  DN 56-3, at PageID # 876; Exhibit C, DN 57-4 at 17_44_24.  Volentine lost sight of Chowning's car, and he returned to the scene of the shooting to await an investigation.  DN 56-3, at PageID # 875.  At 5:47 p.m. he called dispatch to report "I fired one shot at him." Exhibit C, DN 57-4 at 17_47_04.

On July 12, 2019, Chowning brought this action under 42 U.S.C. §1983 against Defendants Hardin County, John Ward, and Henry Volentine.  DN 1.  Chowning alleges that Volentine used unreasonable deadly force in violation of the Fourth Amendment, that Ward authorized or approved the unconstitutional conduct, and that Hardin County and Ward failed to adequately train and supervise officers including Volentine. DN 1, Cts. 1, 3, 4.  Chowning also asserts several claims under Kentucky law.  DN 1, Cts. 2, 5, 6.  Defendants now move the Court to grant summary judgment in their favor on all of Plaintiff's claims.

## II.  STANDARD

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial burden of explaining the basis of its motion and demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  That burden may be

satisfied only by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the . . . presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). Should the movant meet its burden, the nonmovant must produce evidence showing a genuine issue for trial. *Celotex*, 477 U.S. at 324.

When considering a motion for summary judgment, the Court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 1774, 167 L. Ed. 2d 686 (2007). Even so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobb, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient." *Id.* at 252.

## III.  DISCUSSION

The Court will first examine the federal claims.

### A.  Federal Claims

#### 1.  § 1983 Claim Against Volentine

42 U.S.C. § 1983 imposes civil liability on any person who, acting under color of state law, deprives another of a right secured by the Constitution of the United States. Chowning claims that Volentine deprived him of his rights under the Fourth Amendment by using excessive and deadly force to prevent him from fleeing. Volentine contends that no constitutional violation occurred and also asserts that he is entitled to qualified immunity.

### a. Qualified Immunity

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). The purpose of qualified immunity is to insulate officials from "undue interference with their duties and from potentially disabling threats of liability." *Id.* at 806. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815, 86 L.Ed. 2d 411 (1985). The "entitlement is an *immunity from suit* rather than a mere defense to liability; and . . . it is effectively lost if a case is erroneously permitted to go to trial." *Id.* (emphasis in original). Therefore, the issue of qualified immunity should be resolved "at the earliest possible state in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 536, 116 L. Ed. 2d 589 (1991).

The analysis of qualified immunity involves two questions: (1) whether the facts alleged by the plaintiff support a finding that the defendant violated a constitutional right; and (2) "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). The Court has discretion in deciding which inquiry to address first "in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009). The Court will first determine whether the facts alleged by Chowning support a finding that his rights were violated, and then address whether that right was clearly established.

### i.  Fourth Amendment Constitutional Violation

This shooting occurred in the context of a stop and an attempted arrest.  When an "excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989).  Courts have held that "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 1699, 85 L. Ed. 2d 1 (1985).  To decide whether the force an officer used was reasonable, the Court must balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Garner*, 471 U.S. at 8).  This standard requires analysis of "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

In applying the "reasonableness" standard, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 397. This is an objective analysis but must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving— about the amount of force that is necessary in a particular situation." *Id.* at 397.

With respect to the use of deadly force on a fleeing felony suspect, the Fourth Amendment does not permit a police officer to "seize an unarmed, nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11.  In contrast, "[w]here the officer has probable cause to believe that

the suspect poses a threat of serious physical harm, either to the officer or to others, it is not

constitutionally unreasonable to prevent escape by using deadly force." *Id.*

In cases involving vehicular flight, the Sixth Circuit has developed the following

framework to evaluate the use of deadly force:

> Where a suspect is attempting to flee in a vehicle, police officers are "justified in
> using deadly force against a driver who objectively appears ready to drive into an
> officer or bystander with his car. But, as a general matter, an officer may not use
> deadly force once the car moves away, leaving the officer and bystanders in a
> position of safety." An officer may, however, "continue to fire at a fleeing
> vehicle even when no one is in the vehicle's direct path when the officer's prior
> interactions with the driver suggest that the driver will continue to endanger
> others with his car." Still, where the car no longer "presents an imminent
> danger," an officer is not entitled to use deadly force to stop a fleeing suspect.

*Godawa v. Byrd*, 798 F.3d 457, 464 (6th Cir. 2015) (quoting *Cass v. City of Dayton*, 770 F.3d 368,

375); *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005)) (internal citations omitted).

The parties dispute whether Volentine intentionally shot Chowning. However, Volentine

argues that even had the shooting been intentional, he is entitled to summary judgment because his

actions were reasonable. DN 61, at PageID # 1802.

The circumstances prevent a finding that the shooting was a reasonable use of force. At

the time of the incident, Volentine was attempting to arrest Chowning for the nonviolent offenses

of failure to appear and possession of a controlled substance. Chowning was fleeing at the time

of the incident. Defendants contend that since Chowning was resisting arrest and fleeing, the use

of deadly force was justified. There is no allegation that Chowning was physically resisting arrest

in any manner other than by flight. "[A]n officer may not use deadly force once the car moves

away, leaving the officer and bystanders in a position of safety." *Cass*, 770 F.3d at 375 (citation

omitted).

8

There is a genuine issue of material fact in this case whether Chowning posed "an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. The threat element "is a *minimum* requirement for the use of deadly force, meaning deadly force may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm." *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (citation omitted) (emphasis in original).

Volentine asserts that he was justified in using deadly force because Chowning was "endangering the officer and other citizenry." DN 50, at PageID # 1850. Volentine testified in his deposition that he drew his weapon after seeing Chowning reach for the center console because he thought Chowning was probably reaching for a gun. DN 56-3, at PageID # 844–45. However, Volentine's earliest reports of the incident do not mention Chowning reaching for a possible weapon, and instead state that Volentine drew his weapon because Chowning refused to exit the vehicle. DN 57-2, at PageID # 1552, 1557. Volentine does not claim he saw Chowning holding a gun or any weapon in the vehicle. Duvall testified that Chowning did not reach for anything. DN 56-2, at PageID # 790. The dispute of fact over Chowning's actions prevents a finding that Volentine was justified in shooting Chowning related to any fear that Chowning may have had a weapon.

At the time Chowning started driving away, he was aware that Volentine had grabbed onto his door handle. But Chowning was driving away and was not intentionally targeting Volentine with his vehicle. The only contact with the vehicle was through Volentine's own action in holding on to the door handle. Volentine does not point to evidence that Chowning threatened him or others with the vehicle. Although Volentine contends that his body was dragged by the velocity

of the car, this fact is disputed.  Taking the facts in the light most favorable to Chowning, a jury could find that Volentine intentionally shot at a non-threatening fleeing vehicle.

Prior to Chowning's purported reach to the center of the vehicle, the encounter had been nonconfrontational.  Volentine had allowed Chowning to keep the car's engine running during the entire encounter.  Volentine also allowed Chowning to use his cell phone and returned to his patrol car at least twice during the encounter.  No additional circumstances existed during the traffic stop that would lead a reasonable officer to believe that Chowning posed a threat of serious physical harm.

Therefore, a reasonable jury could find that Volentine's use of deadly force violated Chowning's Fourth Amendment rights.

### ii.  Clearly Established Constitutional Right

A law enforcement officer sued under § 1983 is entitled to qualified immunity unless it is shown that he violated a constitutional right "so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." *Bouggess v. Mattingly*, 482 F.3d 886, 894 (6th Cir. 2007) (quoting *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987)). This will protect an officer who makes a decision that "even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted."  *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583 (2004).

Because the reasonableness of the use of force is fact dependent, "police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue."  *Kisela v. Hughes*, 200 L. Ed. 2d 449, 138 S. Ct. 1148, 1153 (2018) (citations omitted). General standards may be sufficient to establish that a use of force is clearly unreasonable in an

obvious case.  *Id.*  However, the qualified immunity analysis recognizes that "reasonable mistakes can be made as to the legal constraints on particular police conduct."  *Saucier v. Katz*, 533 U.S. 194, 205, 121 S. Ct. 2151, 2158, 150 L. Ed. 2d 272 (2001).  "Precedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful." *Kisela*, 138 S. Ct. at 1153 (citations omitted).

"It has been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others." *King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012) (citations omitted).  However, Sixth Circuit precedent goes beyond this general prohibition requiring a threat in order to use deadly force.

In *Godawa v. Byrd*, an officer shot at a suspect fleeing from an arrest in his car.  *Godawa v. Byrd*, 798 F.3d 457, 460 (6th Cir. 2015).  In that case, the defendant officer had come into contact with the suspect's vehicle.  *Id.* at 461–62.  The Court determined the evidence could "reasonably be interpreted as indicating that Defendant was not directly in front of the vehicle, but rather was located ahead of the vehicle *to the right* of the passenger side during the relevant timeframe and the car never 'targeted' Defendant."  *Id.* at 463 (emphasis in original).  Viewing the facts in the light most favorable to the plaintiff, the Court "assume[d] that Defendant was not actively struck by Godawa's car, but initiated the impact with the vehicle in his efforts to keep Godawa from fleeing." *Id.* Therefore, "Godawa did not pose an immediate threat at the time Defendant discharged his weapon."  *Id.*  The Court further determined that a jury could conclude that the officer "actively 'put himself in a dangerous position in order to effectuate an arrest' by running alongside the car."  *Id.* at 465–66 (quoting *Smith v. Cupp*, 430 F.3d 766, 774 (6th Cir. 2005)).  Additionally, at the time the officer fired the shot at the suspect, he was positioned such

11

that he "would have had no reason to fear being struck by the car as it continued to advance." *Id.*
at 466.

The Sixth Circuit went on to distinguish the facts in *Godawa* from *Brosseau v. Haugen*,
543 U.S. 194. In *Brosseau*, the Court found a fleeing suspect posed a threat to officers and others
in the neighborhood and had engaged in an extended flight proving "he would do almost anything
to avoid capture." *Id.* at 200. The *Godawa* Court went onto explain "unlike the fleeing suspect in
*Brosseau,* Godawa posed no discernable threat to the officers or to any other individuals at the
time he was shot." 798 F.3d at 466. The court concluded "that a reasonable jury could find that
Defendant's use of force violated Godawa's Fourth Amendment rights." *Id.* at 467.

Under the facts alleged by Chowning, *Godawa* is controlling. Like the officer in *Godawa,*
it is undisputed that Volentine initiated the contact with the vehicle in order to effectuate the arrest,
and there is no evidence Chowning was targeting Volentine with the vehicle. Like *Godawa*,
Volentine ultimately fired his weapon as Chowning was driving away from, not towards, him.
Chowning alleges there was no danger to any other person, and Volentine has failed to identify
evidence that contradicts this allegation.

Volentine asked this Court to consider his conduct in light of *Plumhoff v. Rickard*, 572 U.S.
765, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014). In that case, police officers shot at a fleeing
vehicle after a high-speed chase and after the suspect's vehicle continued to strike police cruisers
and endanger multiple officers and citizens. *Id.* at 776–77. The Court determined that using
deadly force in order to terminate a dangerous car chase did not violate the Fourth Amendment.
*Id.* at 777. The facts taken in the light most favorable to Chowning in this case clearly differ from
*Plumhoff*, in that there was no high-speed chase, Chowning had not presented a danger to any other

person, and the danger to Volentine only arose from his own intentional contact with Chowning's vehicle.

Volentine also asks the Court to consider *Scott v. Harris*, but again in that case the officers used force to terminate a high-speed car chase.  550 U.S. 372, 386, 127 S. Ct. 1769, 1779, 167 L. Ed. 2d 686 (2007).  The Court found that the suspect threatened the lives of innocent bystanders, and therefore the officer's use of force was reasonable.  *Id.* at 384–86.  Chowning has alleged there was no danger to innocent bystanders in this case, and a reasonable jury could find the same.

Given that the facts of this case closely resemble those in *Godawa*, a reasonable jury could conclude that a reasonable officer in Volentine's position would know that the use of deadly force under the circumstances was unconstitutional.  Therefore, Volentine is not entitled to qualified immunity on the Fourth Amendment claim.

### b.  Accidental Discharge Theory

Volentine alleges that he constitutionally drew his gun and then events transpired which caused his weapon to fire unintentionally, and that under those circumstances there was no Fourth Amendment violation.  DN 50, at PageID # 1846–50.  However, there are a multitude of factual disputes precluding a finding that the weapon was drawn constitutionally and that the subsequent shooting was accidental.

The parties dispute when Volentine drew his gun.  Duvall and Chowning never saw Volentine holding a gun, and Volentine has given contradictory reports on this point.  On July 12, Volentine wrote in his report of the incident that: "Ronald would not get out of the car so I drew my gun and commanded several more times for him to exit the vehicle."  DN 57-2, at PageID # 1552.  A Kentucky State Police investigator reported Volentine's preliminary statement as: "Chowning began reaching around his right side, at which time Deputy Volentine drew his

weapon." DN 57-3, at PageID # 1566.  In his deposition, Volentine asserted that he drew his weapon as he was opening Chowning's door after seeing Chowning reach for the center console. DN 56-3, at 844-845, 856–60.

The parties also dispute whether Volentine was able to, and in fact did, open Chowning's door and whether the car was dragging him, or he was running beside it.  The parties also dispute whether Volentine's body hit the car.  Volentine did not report any injury from the car dragging him or from his body striking the moving vehicle and there is no evidence that any injury was observed.  DN 56-3, at PageID # 891. Volentine asserts that the car dragging him and the door swinging open caused his body to collide with the rear door, and that somehow that impact caused his weapon to fire.

Volentine also testified that his finger was not on the trigger when his service weapon, a Glock 22, fired the shot at Chowning.  DN 56-3, at PageID # 892.  However, Chowning points to the manufacturers materials that state the trigger safety is "designed to prevent the pistol from firing if it's dropped or if the trigger is subjected to any pressure that isn't a direct firing pull."  DN 57-6, at PageID # 1622.  Thus, there is a factual dispute about whether the pistol could possibly fire without a finger on the trigger as Volentine asserts.   Additionally, Chowning argues Volentine's call to dispatch stating that "I fired one shot at him" refutes any later testimony that the shooting was accidental.

There is a dispute of fact about when Volentine drew his weapon, whether he was able to open the door of the vehicle, whether he was dragged by the vehicle or ran along beside it, whether his body was thrown against the rear passenger door, and whether it is possible for the Glock 22 to accidentally discharge in the manner Volentine asserts.  Whether the shot was fired accidentally

14

or intentionally is a determination based upon disputed facts and thus cannot be determined on summary judgment.

### 2.  § 1983 Fourth Amendment Supervisory Liability

Chowning seeks to hold Ward liable in his individual capacity under a claim of Fourth Amendment supervisory liability.  DN 1, Ct. 3.  An individual-capacity § 1983 claim "seeks to hold an official personally liable for the wrong alleged." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016).  But on a claim of supervisory liability, an "official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir. 1982)).  The Sixth Circuit has explained that a plaintiff must demonstrate that a supervisor "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct." *Id.*

Ward argues that there is no evidence that he participated in the shooting or "implicitly authorized, approved, or knowingly acquiesced in the incident."  DN 50, at PageID # 1839. Chowning has failed to respond to this argument regarding Ward's supervisory liability in his individual capacity and has thus waived this claim.  *See, e.g., Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989).

### 3. *Monell* Liability

Chowning argues that Hardin County is liable under § 1983 for Sheriff Ward's ratification of the instances of excessive force by Hardin County Sheriff's Office (HCSO) deputies, his failure to supervise, investigate, or punish officers who used excessive force, and HCSO's custom of tolerance or inaction towards his officer's use of excessive force.   DN 57 at PageID # 1539–41.

15

Local government bodies are liable under § 1983 for depriving citizens of rights secured by the constitution.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978).  However, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691 (emphasis in original).  Instead, local governments may be sued for an official policy or "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91.  The Sixth Circuit has explained the plaintiff's burden in demonstrating a § 1983 claim against a municipality:

> A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations."

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

Chowning argues that he can establish Hardin County's liability under three of the four methods: ratification of illegal actions by an official with final decision-making authority, inadequate training or supervision, and a custom of tolerance or acquiescence of federal rights violations.  To prove a *Monell* claim "a plaintiff must identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Jackson v. City of Cleveland*, 925 F.3d 793, 829 (6th Cir. 2019) (citation omitted).

### a. Ratification

Chowning argues that because Ward was an official with final decision-making authority, his ratification of Volentine's allegedly unconstitutional act and similar actions by other officers makes Hardin County liable for a Fourth Amendment violation.  The Sixth Circuit has explained that "[a] plaintiff can establish municipal liability by showing that the municipality ratifies the

unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct." *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 882 (6th Cir. 2020). In *Wright*, a police chief "testified that he had never heard of a use of force incident by [one of his] officer[s] that seemed inappropriate to him." *Id.* The Court found that this was evidence of ratification such that "a reasonable jury could decide that use of excessive force is ratified by the department." *Id.* However, in that case, this finding was combined with evidence of "offensive statements and depictions" in the city's official training, which when combined with the police chief's dismissive statement concerning the use of excessive force by his officers, was sufficient to show a culture of approving the use of excessive force. *Id.*

Chowning argues that Ward failed to meaningfully investigate three prior uses of deadly force by HCSO employees, and this demonstrates Ward's ratification of the conduct. However, these incidents do not support Chowning's contentions.

On March 27, 2017, Sergeant Taylor Miller fired a weapon at a suspect he reported was targeting him with a vehicle. DN 57-12, at PageID # 1663. HCSO conducted an administrative review of the incident and found no policy violation. DN 56-4, at PageID # 977. Chowning has not presented evidence concerning the administrative investigation, and thus cannot support a bald allegation that the investigation was not meaningful.

On February 8, 2018, Deputy Clennon Smith shot a reckless driving suspect. DN 57-14, at PageID # 1691. Chowning argues this shooting was not justified because Smith could not identify a threat from Williams that caused him to fire the shot. DN 57, at PageID # 1526, DN 57-14, at PageID # 1712. However, a Kentucky State Police (KSP) investigation into the shooting was completed immediately following the incident. DN 57-15, at PageID # 1746. HCSO also began an administrative investigation into the shooting, but abandoned the investigation when

17

Smith resigned.  DN 56-4, at PageID # 973–74.  As a result, Ward did not discipline Smith for his actions, though he did state that Smith *would have received discipline* for a violation of the warning shot policy had he remained with HCSO.  DN 57-15, at PageID # 1746, 1757.

A third incident, involving Sheriff Ward and two deputies, resulted in the shooting of a murder suspect who displayed a weapon at a school.  DN 56-4, at PageID # 975.  The KSP conducted an investigation into the incident.  *Id.*  Chowning has not produced evidence that this investigation was not meaningful.

All three of the prior shooting incidents were investigated in some way.  Chowning argues that no administrative review was conducted within the HCSO for the Smith and Ward shootings, however an investigation was conducted into these incidents by the KSP.  "In cases where an investigation has been conducted, courts have been reluctant to impose municipal liability based on a ratification theory."  *Woodcock v. City of Bowling Green, Kentucky*, 165 F. Supp. 3d 563, 603 (W.D. Ky. 2016), *aff'd in part*, *rev'd on other grounds* 679 F. App'x 419 (6th Cir. 2017) (quoting *Daniels v. City of Columbus*, No. C2-00-562, 2002 WL 484622, at *6 (S.D. Ohio Feb. 20, 2002)).  Ward also testified that he planned to discipline Smith before he resigned from HCSO.

Chowning has failed to demonstrate that Ward failed to meaningfully investigate because he has provided no information concerning the content of these investigations.  He has failed to demonstrate that Ward failed to punish constitutional violations because he has not shown that constitutional violations occurred in other cases.  Therefore, Chowning has not demonstrated that Ward ratified unconstitutional excessive force by failing to investigate and punish uses of excessive force.

For these reason, Hardin County is entitled to summary judgment on the ratification claim.

18

### b.  Inadequate Training or Supervision

Chowning contends that he can establish that HCSO maintained a custom of inadequate training or supervision.  To prove inadequate training or supervision Chowning must come forward with evidence of "prior instances of unconstitutional conduct demonstrating that the municipality had ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (cleaned up).  But "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011).  Indeed, a municipality's failure to train its employees in a relevant respect must "amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)).  This generally necessitates a demonstration of a "pattern of similar constitutional violations by untrained employees." *Id.* at 62.  Additionally, "a municipality's improper training or supervision must have 'actually caused' the plaintiff's injury." *Gambrel v. Knox Cnty., Kentucky*, 25 F.4th 391, 408 (6th Cir. 2022) (quoting *Connick*, 563 U.S. at 70).  Thus, the plaintiff must demonstrate that "proper training would have prevented" the constitutional violation. *Id.* at 409.

Chowning has pointed to three prior incidents of use of deadly force, but has not provided evidence of a constitutional violation in the Miller and Ward shootings, and investigations into those incidents did not produce evidence of a constitutional violation.  Therefore, these incidents cannot demonstrate that the training in this area was deficient.   Chowning argues that the Smith shooting involved a constitutional violation.  The facts of that case bear some similarity to Volentine's alleged misconduct.  However, there is no evidence that one prior incident can

19

establish "a 'pattern' of conduct giving rise to an inference of deliberate indifference." *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1287 (10th Cir. 2019).

The Supreme Court has indicated that it may not be necessary to demonstrate a pattern of misconduct if there is an obvious need for a certain type of training, "the failure to provide the obviously needed training 'could properly be characterized as "deliberate indifference" to constitutional rights.'" *Gambrel*, 25 F.4th at 408 (quoting *Canton*, 489 U.S. at 390 n.10). However, Ward has demonstrated that his deputies were provided training on use of force through the Kentucky Department of Criminal Justice Training. DN 56-4, at PageID # 957. HCSO provided training on use of force by requiring deputies to read policies, and firearm instructors also provided training on use of force at the firing range. DN 56-4, at PageID # 957. While the need for training in the proper use of force was obvious, there is evidence that this training was provided. Thus there is no evidence of "the complete lack of training that *Canton* hypothesized." *Gambrel*, 25 F.4th at 411. Arguments that the training fell short in one prior incident do not demonstrate that the need for different training was obvious.

In *Burgess v. Fischer*, the Court ruled against the plaintiff on a failure to train and supervise claim because the plaintiff had not produced facts to demonstrate similar misconduct putting the local government body on notice of deficient training. 735 F.3d at 478. In *Wright*, the Court found that a reasonable juror could find the police officer's training on the proper use of force was deficient because it consisted of reading policies and engaging in practical training exercises that "never changed, and the officers' were never evaluated." 962 F.3d at 881. However, this evidence was considered in conjunction with evidence that the police department training demonstrated a culture of approving excessive force. *Id.* at 880–81. Chowning cites to no evidence other than the prior shooting incidents to demonstrate a culture of approving excessive force in the HCSO.

20

### c.  Custom of Tolerance

Chowning argues that the HCSO has a custom of tolerating or acquiescing to the use of excessive force against arrestees, and that acquiescence caused Chowning's injury.  "[A] custom-of-tolerance claim requires a showing that there was a pattern of inadequately investigating similar claims."  *Burgess*, 735 F.3d at 478.   The Sixth Circuit further explained the custom of tolerance claim in *Thomas v. City of Chattanooga*:

> [T]his Court articulated the requirements for a municipal liability claim made on the basis of an "inaction theory," where a policy of tolerating federal rights violations is unwritten but nevertheless entrenched. We stated that, under such a theory, the plaintiff must show:
> (1) the existence of a clear and persistent pattern of [illegal activity];
> (2) notice or constructive notice on the part of the [defendant];
> (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
> (4) that the [defendant's] custom was the "moving force" or direct causal link in the constitutional deprivation.

398 F.3d 426, 429 (6th Cir. 2005) (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)).

In this case, as stated previously, Chowning has failed to demonstrate a clear and persistent pattern of constitutional violations in the HCSO.  Therefore, Chowning has not met his burden to demonstrate this necessary element of a custom-of-tolerance claim. Therefore, summary judgment will be granted to Hardin County on the custom-of-tolerance claim.

Because Chowning has failed to demonstrate ratification or a custom-of-tolerance of unconstitutional conduct and has not shown that HCSO officers were inadequately trained or supervised concerning the use of deadly force, Ward and Hardin County will be granted summary judgment on the *Monell* claim.

### B.  State Law Claims

#### 1.  Battery

Chowning argues that Volentine committed a battery when he shot Chowning.    Under Kentucky law, a battery is "any unlawful touching of the person of another, either by the aggressor himself, or by any substance set in motion by him." *Vitale v. Henchey*, 24 S.W.3d 651, 657 (Ky. 2000) (quoting *Sigler v. Ralph*, 417 S.W.2d 239, 241 (Ky. 1967)).  The plaintiff cites to *Ali v. City of Louisville* to support the proposition that a police "officer is liable for the intentional tort of battery, not for negligence, when he deliberately exceeds the privileged amount of force by committing an unwarranted violence on the arrestee." *Ali v. City of Louisville*, No. 3:03-CV-427-R, 2006 WL 2663018, at *8 (W.D. Ky. Sept. 15, 2006).  Volentine asserted qualified official immunity as to this claim.  "In Kentucky, qualified official immunity applies only to a public officer's negligent performance of discretionary acts." *Id.*  Because battery is an intentional act, qualified official immunity does not apply.

Volentine concedes that "frankly, if the Court determines that a potential Fourth Amendment violation occurred then summary judgment would be precluded here."  DN 50, at PageID # 1857.  The Court has found that, viewing the evidence in the light most favorable to Chowning, a reasonable jury could conclude that Volentine violated Chowning's Fourth Amendment rights.  Therefore, summary judgment on the battery claim will be denied.

#### 2.  Negligence Claims

##### a. Volentine

Chowning did not respond to Volentine's argument that he is entitled to summary judgment on the negligence and gross negligence claims.  Under Kentucky law "[t]he use of excessive force by a police officer constitutes the intentional tort of battery." *Ali*, 2006 WL 2663018, at *8.  As

Chowning has failed to respond to Volentine's argument on this issue, the negligence and gross negligence claims against Volentine are waived.  *See, e.g., Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989).

### b. Ward

Chowning has asserted a negligent supervision claim against Ward for negligently failing to enforce HCSO policies.  DN 57, at PageID # 1543.   A negligence action under Kentucky law requires "proof of: (1) a duty on the part of the defendant; (2) a breach of that duty; (3) a consequent injury, which consists of actual injury or harm; and (4) legal causation linking the defendant's breach with the plaintiff's injury."  *West v. KKI, LLC*, 300 S.W.3d 184, 190 (Ky. App. 2008).

Chowning argues that Ward had a ministerial duty to enforce HCSO policies on excessive force, and that Ward failed to adequately train and supervise his deputies' compliance with these policies.  He urges that this is evidenced by Ward's failure to investigate or provide remedial training after the Smith and Miller shooting incidents.  *See* DN 57-12; DN 57-14; DN 56-4, at PageID # 971, 973.  Chowning claims Smith and Miller violated HCSO policies on drawing a firearm, firing at a moving vehicle, and using deadly force.  DN 57, at PageID # 1545; DN 57-11, at PageID # 1650, 1656.  Chowning argues that Ward breached his duty to enforce these policies. He argues this breach was a substantial factor in causing Volentine's subsequent violation of these policies when he shot Chowning, because "a reasonable jury could conclude that strict enforcement would have prevented Volentine's conduct." DN 57, at PageID # 1546.  Chowning does not, however, point to any evidence in the record showing that Ward's alleged acts or omissions caused Volentine's actions.  Therefore, the negligence and gross negligence claims against Ward must fail as a matter of law.  For that reason, the Court will grant summary judgment in Ward's favor.

23

### 3.  Statutory Vicarious Liability

Chowning has asserted a claim for vicarious liability for Deputy Volentine's acts under Kentucky Revised Statutes (KRS) 70.040 against Hardin County and Ward.  KRS 70.040 provides:

> The sheriff shall be liable for the acts or omissions of his deputies; except that, the office of sheriff, and not the individual holder thereof, shall be liable under this section.  When a deputy sheriff omits to act or acts in such a way as to render his principal responsible, and the latter discharges such responsibility, the deputy shall be liable to the principal for all damages and costs which are caused by the deputy's act or omission.

The defendants argue that Chowning improperly sued Ward in his individual capacity on this claim.   The statute states in relevant part: "the office of the sheriff, and not the individual holder therof, shall be liable under this section."  KRS 70.040.  Chowning provides no factual or legal basis for holding Ward liable under this statute in his individual capacity.  As the claim directly conflicts with the express terms of the statute, summary judgment in Ward's favor on this claim will be granted.

The defendants assert that the statute does not impose any liability on Hardin County, but instead liability is imposed against "the office of the sheriff."  KRS 70.040.  However, "official-capacity suits are, for all intents and purposes, treated as suits against the municipality." *Shorts v. Bartholomew*, 255 F. App'x 46, 49 n.4 (6th Cir. 2007).  "Where the entity is named as a defendant, an official-capacity claim is redundant."  *Foster v. Michigan*, 573 F. App'x 377, 390 (6th Cir. 2014).  Therefore, because an official capacity suit is treated as a suit against the county, Chowning has properly named Hardin County as a defendant in this claim.

The defendants argue "there are no actions for which Ward would be held responsible." DN 50, at PageID # 1856.  The statute states: "The sheriff shall be liable for the acts or omissions of his deputies."  KRS 70.040.  Chowning has alleged acts or omissions by Deputy Volentine.  The Kentucky Supreme Court has explained that the office of the sheriff is subject to suit "because that

24

statute codifies the long tradition in our law that the sheriff will be answerable for his deputies' wrongful performance of their duties, a tradition the record before us does not allow us to question." *Jones v. Cross*, 260 S.W.3d 343, 348 (Ky. 2008) (Abramson, J., concurring).

Finally, the defendants argue that Hardin County is entitled to sovereign immunity from suit under Kentucky law.  A Kentucky "county government is cloaked with sovereign immunity. Nor can a county, absent a legislative waiver of immunity, be held vicariously liable in a judicial court for the ministerial acts of its agents, servants, and employees."  *Schwindel v. Meade Cnty.*, 113 S.W.3d 159, 163 (Ky. 2003) (citations omitted).  However, the Kentucky Supreme Court has reasoned that in KRS 70.040, "the legislative waiver of immunity is very clear, and [] the plain language of KRS 70.040 leaves no room for any other reasonable construction than a waiver of the sheriff's official immunity (the office of sheriff) for the tortious acts or omissions of his deputies." *Jones*, 260 S.W.3d at 346 (majority opinion).

Therefore, Hardin County is not entitled to sovereign immunity on the statutory vicarious liability claim, and summary judgment will be denied.

**IV.  CONCLUSION**

For the reasons stated above, the Court will grant in part and deny in part Defendants' motion for summary judgment (DN 50).  A separate order will be entered this date in accordance with this opinion.

September 30, 2022

Charles R. Simpson III, Senior Judge
United States District Court

25